**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | **FOR PUBLICATION** |
| CELSIUS NETWORK LLC, *et al.,* | Case No. 22-10964 (MG) |
| Post-Effective Date Debtors. | Chapter 11 |
| MOHSIN Y. MEGHJI, as Representative for the Post-Effective Date Debtors, | |
| Plaintiff, | Adv. Pro. No. 24-04004 (MG) |
| v. | |
| ANTOINE CASTEL. *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**
**DENYING DEFENDANT CURATED'S MOTION TO DISMISS**

*A P P E A R A N C E S :*

AKIN GUMP STRAUSS HAUER & FELD LLP
*Attorneys for Mohsin Y. Meghji, Litigation Administrator for Celsius Network LLC*
One Bryant Park
New York, New York, 10036
By:     Mitchell P. Hurley, Esq.
            Dean L. Chapman Jr., Esq.

2300 North Field Street
Dallas, Texas 75201
            Elizabeth D. Scott, Esq.
            Nicholas R. Lombardi, Esq.

MCDERMOTT WILL & EMERY LLP
*Attorneys for Curated*
One Vanderbilt Avenue
New York, NY 10017
By:     Joseph B. Evans, Esq.

2049 Century Park East
Suite 3200
Los Angeles, California 90067
By:    Joshua Yim, Esq.

**MARTIN GLENN**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the contested motion (the "Motion," ECF Doc. # 26) of defendant Curated ("Curated" or "Defendant"), seeking dismissal, with prejudice, of all counts asserted in the amended adversary complaint (the "Complaint," ECF Doc. # 1) filed by Mohsin Y. Meghji in his capacity as Litigation Administrator (the "Litigation Administrator" or "Plaintiff") for Celsius Network LLC and its Debtor Affiliates ("Celsius" or the "Debtors") in the above-captioned cases (the "Chapter 11 Cases"), pursuant to the *Modified Joint Chapter 11 Plan of Reorganization of Celsius Network LLC and its Debtor Affiliates (Conformed for MiningCo Transaction)* (the "Plan," ECF Doc. # 4289).[1]

On November 19, 2024, the Litigation Administrator filed a memorandum of law in opposition to the Motion (the "Opposition," ECF Doc. # 42).  On December 13, 2024, Curated filed a reply (the "Reply," ECF Doc. # 52).

For the reasons discussed below, the Court **DENIES** the Motion.

## I.    BACKGROUND

The following facts are drawn from the complaint filed by the Litigation Administrator, except where otherwise indicated.

---

[1]    References to ECF docket numbers shall refer to those in the adversary proceeding unless otherwise specified.  Additionally, defined terms used but not defined herein shall have the meanings ascribed to them in the Plan.

### A. Celsius' Business

1. <u>CNL's Business</u>

Debtor Celsius Network Limited ("CNL") is a private limited company incorporated under the laws of England and Wales. (Complaint ¶ 3.) CNL was founded in 2017 with the objective of becoming one of the first cryptocurrency platforms to offer users the ability to earn "rewards" and secure loans using their digital assets. (*Id.* ¶ 29.) CNL's business model focused on the deployment of digital assets to generate income. CNL's operations included offering loans of fiat currency and "stablecoins" (cryptocurrencies pegged to fiat currencies) to third-party retail borrowers in exchange for the posting of cryptocurrency in excess of the amount loaned by the borrower. (*Id.* ¶ 30.)

In or around late 2019 or early 2020, Celsius began to consider additional investment strategies designed to generate revenue growth, including "staking" and activities involving decentralized finance ("DeFi"). (*Id.* ¶¶ 31–32.) Staking is a revenue-generation strategy that involves the provision of cryptocurrency coins to a third-party platform, usually in the form of a coin or "reward"; the practice does not involve trading cryptocurrencies or speculating in cryptocurrency assets. (*Id.* ¶ 31.) Subject to a potential lockup period, the staking party generally has the right to have the staked coins returned. (*Id.*) DeFi generally refers to activities occurring on a blockchain involving the provision of borrowing, lending, and other financial services without the use of a traditional institutional intermediary. (*Id.* ¶ 32.) Instead, DeFi typically leverages the use of "smart contracts," programs stored on the blockchain which operate on the basis of preset conditions without the need for intermediaries to facilitate the execution of agreements and other functions. (*Id.*)

2.   CNL's Transactions with KeyFi & Jason Stone

a. *Staking Services Agreement*

In August 2020, CNL entered into an agreement in principle with Jason Stone ("Stone"), a self-described entrepreneur in the staking space.  (*Id.* ¶¶ 34–35.)  Per the terms of the agreement, Stone would serve as CEO of a new CNL subsidiary formed to operate Celsius' staking and DeFi activities.  (*Id.* ¶ 35.)  In anticipation of a lengthy pre-closing window, Stone was authorized to begin deployment of Celsius' coins on CNL's behalf pending the finalization of the agreement in principle.  (*Id.* ¶ 36.)  On October 1, 2020, CNL and the subsidiary, KeyFi Inc. ("KeyFi Vehicle") executed a non-binding memorandum of understanding concerning deployment of CNL's coins, in anticipation of the execution of an asset purchase agreement whereby CNL would formally acquire KeyFi Vehicle's business.  (*Id.* ¶ 38.)  The memorandum of understanding anticipated that KeyFi Vehicle would be temporarily authorized to deploy CNL coins in DeFi activities pursuant to a service agreement, which was subsequently signed by the parties on October 7, 2020.  (*Id.* ¶¶ 38–39.)  The service agreement was amended on December 31, 2020, when the asset purchase agreement was executed; the amended service agreement replaced KeyFi Vehicle with the newly-formed CNL subsidiary Celsius KeyFi LLC ("Celsius KeyFi").  (*Id.* ¶¶ 40–41.)  Pursuant to the asset purchase agreement, Stone was appointed CEO of Celsius KeyFi and was authorized to continue deploying CNL's coins in that capacity as part of authorized DeFi activities.  (*Id.* ¶¶ 41–42.)

b. *Breakdown in Relationship and March 2021 Board Resolutions*

Beginning in late 2020 and early 2021, Celsius executives became concerned with Stone and other Celsius KeyFi executives' (the "KeyFi Executives") apparent unwillingness to provide timely reporting and other visibility into the deployment of CNL coins, as well as the occurrence

4

of two separate liquidation events resulting in the loss of nearly 30 million USD.  (*Id.* ¶¶ 43–45.)

Accordingly, Celsius instructed the KeyFi Executives to return the coins Celsius had transferred

for deployment.  (*Id.* ¶ 47.)  Stone and the KeyFi Executives initially committed to develop a

plan for the return of the coins, but ultimately failed to do so.  (*Id.* ¶ 48.)  Accordingly, on March

26, 2021, Celsius KeyFi's board of directors issued written resolutions directing Stone to return

all of CNL's coins and other cryptocurrency assets (the "March 2021 Resolutions").  (*Id.* ¶¶ 49–

50.)  The KeyFi Executives voluntarily returned some of CNL's coins in the weeks following the

March 2021 Resolutions.  (*Id.* ¶ 51.)

### c.  *Continued Misappropriation & Transfer of CryptoPunk NFT*

Even after the issuance of the March 2021 Resolutions, Stone and the KeyFi executives

purportedly retained some of the coins and other Celsius assets, and additionally transferred

other assets to third parties.  (*Id.* ¶ 52.)  As relevant to this adversary proceeding, one of those

transactions involved a series of transfers of a non-fungible token (NFT) called the NFT Zombie

CryptoPunk #3489 (the "CryptoPunk NFT").  (*Id.* ¶ 65(b).)  The KeyFi Executives initially

purchased the CryptoPunk NFT from Defendant Wallet Owner

0xE83C750b2708320bb134796c555b80DF39A3D97B for 130 ETH on or around February 11,

2021, prior to the issuance of the board resolutions directing the return of Celsius assets.  (*Id.*)

On May 3, 2021, over a month after the March 2021 Resolutions, the KeyFi Executives

transferred the CryptoPunk NFT to the 0x50dd wallet, maintained by the KeyFi Executives.  (*Id.*

¶ 66(b).)  Seven months later, on or around December 8, 2021, the KeyFi Executives effectuated

another transfer of the CryptoPunk NFT to Defendant Wallet Owner 0x852C29.  (*Id.*)

Ultimately, Curated purchased the CryptoPunk NFT on or around June 26, 2022.  (*Id.*)

### B. Procedural History

#### a. *Chapter 11 Filing and Stone Adversary Proceeding*

The Debtors filed the Chapter 11 Cases in this Court on July 13, 2022.  (Motion ¶ 81.)

On August 23, 2022, Celsius commenced an adversary proceeding against Stone and the KeyFi

Executives, raising causes of action related to the defendants' purported misappropriation of the

CNL coins.  (*Id.* ¶ 56 (citing Complaint, *Celsius Network Ltd. v. Executive*, ECF #1 (S.D.N.Y.

Bankr. filed Aug. 23, 2022).)  After a two-day trial, the Court concluded that Celsius had "shown

a substantial likelihood of prevailing on the merits," and granted a "temporary restraining order

restraining the defendants from transferring any other assets away."  (*Id.*)  The parties ultimately

settled the adversary proceeding in June 2024; pursuant to the terms of the settlement agreement,

the KeyFi Executives agreed to return "substantial assets" to Celsius.  (*Id.*)

#### b. *Complaint*

The Litigation Administrator commenced the instant adversary proceeding on July 13,

2024.  The Complaint centers on various CNL coins and other assets, including the CryptoPunk

NFT, that Stone and the KeyFi Executives are alleged to have misappropriated.  The Litigation

Administrator alleges six claims against various defendants, including Curated, who are alleged

to have received these misappropriated assets: (1) turnover under 11 U.S.C. § 542(a); (2)

turnover and accounting of documents under 11 U.S.C. § 542(e); (3) actual fraudulent transfer;

(4) constructive fraudulent transfer; (5) unjust enrichment; and (6) accounting.  (Motion ¶¶ 79–

125.)  Plaintiff also alleges violations of the Rackeeter Influenced and Corrupt Organizations

(RICO) Act against a subset of defendants which does not include Curated.  (Motion ¶¶ 126–49.)

c. *Curated's Motion*

Curated filed the Motion on October 4, 2024.  Curated seeks to dismiss the Complaint on

the basis that Plaintiff fails to state a claim for each of the causes of action stated against

Curated.  As to the fraudulent transfer claims, Curated argues that the Litigation Administrator

failed to plead with particularity that Curated acted with intent to defraud in consummating the

acquisition of the CryptoPunk NFT in July 2022, and that none of the traditional "badges of

fraud" are present.  (Motion at 8–9.)  Among other things, Curated notes that it paid a

significantly higher price for the CryptoPunk NFT than the KeyFi Executives did in February

2021, as is reflected on the public blockchain.  (*Id.* at 10.)  Curated also contests that Celsius

was insolvent at the time of the transfers, that the transfers were made at a time when the KeyFi

Executives had "substantial and overwhelming liability to Celsius," and that the Litigation

Administrator is impermissibly grouping the transfer of the CryptoPunk NFT with those of other,

more material CNL assets by Stone and the KeyFi Executives to plead a nonexistent fraudulent

scheme.  (*Id.* at 11–-12.)

As to the constructive transfer claims, Curated posits that Celsius did not receive "less

than reasonably equivalent value" as a result of the transfers of the CryptoPunk NFT, in light of

the purchase price Curated agreed to pay.  (Motion at 14.)  Additionally, the Motion provides

that Celsius cannot recover from Curated as a "mediate good faith transferee" under 11 U.S.C. §

550(b).  (*Id.* at 15.)

Curated also challenges the Complaint's turnover and accounting claims, on the basis that

the CryptoPunk NFT is not "property of the estate" and that there is no fiduciary relationship

between Celsius and Curated.  (Motion at 21–22.)  Finally, Curated seeks dismissal of the unjust

enrichment claim, noting that the Complaint does not plead that Celsius actually transacted with

7

Curated, and separately arguing that Celsius already obtained a recovery for the assets at issue in the Complaint through its settlement agreement with Stone and the KeyFi Executives.  (Motion at 22–23.)

### d.   *Plaintiff's Response*

Plaintiff filed the Response on November 19, 2024, disputing Curated's arguments for dismissal as to each of the claims asserted in the Complaint.  As to the intentional fraudulent transfer claims, the Litigation Administrator emphasizes that it is not the intent of Curated, the transferee, at issue, but that of the KeyFi Executives, who effectuated the transfer.  (Response at 2.)  With respect to the constructive fraudulent transfer claims, Plaintiff counters that Celsius and its affiliates were clearly insolvent at the time of the transfer, which occurred just weeks before the filing of the Chapter 11 Cases.  Plaintiff also challenges Curated's "good faith mediate transferee" argument as raising an affirmative defense not ripe for resolution at the motion to dismiss stage.  (*Id.* at 2–3.)   As to turnover and accounting, the Litigation Administrator responds that the CryptoPunk NFT is "indisputably" property of the estate, and notes that a claim for accounting does not require the existence of a fiduciary relationship or confidential relationship where the account is of a complicated character.  (*Id.* at 3.)  Finally, Plaintiff rejects any suggestion that its unjust enrichment claim must be dismissed due to a lack of "direct privity" between Celsius and Curated.  (*Id.*)

### e.   *Curated's Reply*

Curated's Reply, filed on December 13, 2024, reiterates the bases for dismissal articulated in the Motion and responds to the Litigation Administrator's Response.  First, Curated asserts that—regardless of whose intent is relevant for the purposes of an intentional fraudulent transfer claim—the Complaint fails to allege any facts which "support the proposition

that the transfer[] to [Curated] w[as] intentionally fraudulent." (Reply at 3 (internal citation omitted).) Curated emphasizes its view that no badges of fraud related to the CryptoPunk NFT transfers exist, including insolvency and insufficient consideration. (Reply at 4–5.) As to the constructive fraudulent transfer claim, Curated counters that its anticipated "good faith mediate transferee" affirmative defense is proper for consideration at the motion to dismiss stage, as the defense "appears on the face of the complaint." (Reply at 6 (internal citation omitted).)

Curated also argues that, notwithstanding the presumed "breadth" of the property of a bankruptcy estate, the CryptoPunk NFT is still subject to a "significant dispute," rendering a turnover claim inappropriate. (Motion at 7–8.) As to the accounting claim, Curated disputes the Litigation Administrator's characterization of the blockchain transfers involving the CryptoPunk NFT as "of a complicated character." (*Id.* at 9.) Finally, Curated concedes that privity is not required to state a claim for unjust enrichment, but it insists that the cause of action should be dismissed nonetheless as the connection between Curated and Celsius is "too attenuated." (*Id.* at 8.)

## II.    <u>LEGAL STANDARD</u>

### A.  **Motion to Dismiss Standard**

Federal Rule of Civil Procedure 12(b)(6), made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7012, states that a cause of action must be dismissed for "failure to state a claim upon which relief can be granted." FED. R. CIV. P. 12(b)(6). To survive a Rule 12(b)(6) motion to dismiss, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The "plausibility standard" requires "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Where a complaint pleads

facts that are merely consistent with a defendant's liability, it stops short of the line between

possibility and plausibility of entitlement to relief." *Id.* (internal quotation marks omitted).

On a Rule 12(b)(6) motion to dismiss, courts may consider "facts stated on the face of the

complaint, . . . documents appended to the complaint or incorporated in the complaint by

reference, and . . . matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d

554, 559 (2d Cir. 2016) (internal quotation marks omitted).  "To be incorporated by reference,

the complaint must make a clear, definite and substantial reference to the documents." *DeLuca*

*v. AccessIT Grp., Inc.*, 695 F. Supp. 2d 54, 60 (S.D.N.Y. 2010) (internal quotation marks

omitted).

Courts also may "take judicial notice of matters of public record, including filings in

related lawsuits." *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Secs. Corp.*, 351 F. Supp. 2d

79, 96 n.17 (S.D.N.Y. 2004) (citations omitted).  Bankruptcy courts may take judicial notice of

prior decisions or filings in the same bankruptcy case.  *See, e.g.*, *In re AMR Corp.*, 567 B.R. 247,

250 & n.7 (Bankr. S.D.N.Y. 2017) (taking judicial notice of prior decisions in "several different

adversary proceedings in th[e] bankruptcy" for purposes of considering a motion to dismiss an

adversary complaint); *In re 477 W. 142nd St. Hous., Dev. Fund Corp.*, 2020 WL 3067733, at *7

(Bankr. S.D.N.Y. June 8, 2020) (similar).

Finally, courts may consider documents that, although not expressly referenced in the

complaint, are "nevertheless 'integral' to the complaint." *Goel*, 820 F.3d at 559.  "A document

is integral to the complaint 'where the complaint relies heavily upon its terms and effect.'" *Id.*

(citation omitted).  The "integral" material is typically "a contract or other legal document

containing obligations upon which the plaintiff's complaint stands or falls, but which for some

reason—usually because the document, read in its entirety, would undermine the legitimacy of

the plaintiff's claim was not attached to the complaint." *Glob. Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006).  Consideration of such "integral" documents thus "prevents plaintiffs from generating complaints invulnerable to Rule 12(b)(6) simply by clever drafting." *Id.*

### B.  Rule 9(b) Particularity Standard

Federal Rule of Civil Procedure 9(b) heightened pleading standard, made applicable to this adversary proceeding by Federal Rule of Bankruptcy Procedure 7009,[2] requires plaintiffs to "state with particularity the circumstances constituting fraud or mistake."  Fed. R. Civ. P. 9(b). In fraudulent transfer actions, courts have found that Rule 9(b) requires plaintiffs to describe the specific injury and the legal theories made the basis of its claims in a manner that allows the defendant to prepare an effective answer or defense.  *Am. Tissue, Inc. v Donaldson, Lufkin & Jenrette Sec. Corp.,* 351 F. Supp. 2d 79, 107 (S.D.N.Y. 2004).

### III.    DISCUSSION

Counts III and IV are fraudulent transfer claims applicable to the Celsius Indirect Transfers and the Executive Transfers, respectively; each count asserts that the applicable transactions constituted both intentional fraudulent transfers and constructive fraudulent transfers.  Counts I, II, and VI are turnover and accounting claims.  Count V is for unjust enrichment.

For the reasons explained below, the Court **DENIES** the Motion in its entirety.

---

[2]      Rule 9(b) applies only to the intentional fraudulent transfer claims in Counts III and IV.  *See Sharp Int'l Corp. v. State Street Bank & Trust Co.,* 403 F.3d 43, 55 (2d Cir. 2005).

### A. Fraudulent Transfer Claims

#### 1. Intentional Fraudulent Transfer

The Bankruptcy Code permits a trustee to avoid the transfer of a debtor's interest in property if the transfer was made "with actual intent to hinder, delay, or defraud" the debtor's creditors on or within two years of the filing of the bankruptcy petition.  11 U.S.C. § 548(a)(1)(A).  Claims of intentional fraudulent transfer must be pleaded with particularity.  *In re Actrade Fin. Techs. Ltd.*, 337 B.R. 791, 808 (Bankr. S.D.N.Y. 2005).  Accordingly, the issues for purposes of this motion to dismiss under Rule 12(b)(6) are whether the Litigation Administrator "has adequately pleaded the element of intent to hinder, delay or defraud creditors, and whether he has pleaded intent with the requisite particularity."  *Id.*

Plaintiff alleges two categories of intentional fraudulent transfers involving the Subject Property: Celsius Indirect Transfers and the Executive Transfers.  As applicable to the CryptoPunk NFT, Plaintiff alleges that the Celsius Indirect Transfers began "on or around February 11, 2021," when the Executive Parties initially "caused Celsius to purchase the NFT," and ultimately led to Curated's receipt of the CryptoPunk NFT "on or around June 26, 2022." (Complaint ¶ 65(b).)  The Executive Transfers stem from this same chain of transactions but include a number of additional intervening conveyances of the NFT between various "wallets" allegedly owned or controlled by the Executive Parties in 2021.  (*Id.* ¶ 66(b).)  Under either theory, however, the earliest possible transaction occurred on February 11, 2021, less than two years before Celsius filed for bankruptcy on July 13, 2022; thus, the timing requirements of Section 548(a)(1)(A) pose no bar to the Litigation Administrator's claims.

The analysis therefore turns on whether the Litigation Administrator has adequately and with the requisite particularity pleaded that the transfers of the CryptoPunk NFT were made with

the intent to hinder, delay or defraud Celsius' creditors.  As a threshold matter, and

notwithstanding Curated's suggestions to the contrary,[3] the Litigation Administrator is not

required to establish that the *transferee* intended to hinder, delay or defraud the debtor's

creditors.  Rather, "only the intent of the *transferor* in making the transfer is relevant" in

assessing whether the requirements of § 548(a)(1)(A) have been met.  *In re Extended Stay, Inc.*,

No. 09-13764-JLG, 2020 WL 10762310, at *85 (Bankr. S.D.N.Y. Aug. 8, 2020) (citing

*Actrade,* 337 B.R. at 808).  Because of the difficulty of proving actual intent, a plaintiff may rely

on so-called "badges of fraud," or "circumstances so commonly associated with fraudulent

transfers that their presence gives rise to an inference of intent," to satisfy plausibility and

particularity pleading burdens.  *Extended Stay*, 2020 WL 10762310, at *87 (citing *Sharp Int'l*

*Corp. v. State Street Bank & Tr. Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005)).

The customary badges of fraud considered by courts include:

(1) lack or inadequacy of consideration;

(2) the family, friendship or close associate relationship between the parties;

(3) the retention of possession, benefit or use of the property in question;

(4) the financial condition of the party sought to be charged both before and after the

transaction in question;

(5) the existence or cumulative effect of a pattern or series of transactions or course of

conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of

suits by creditors;

(6) the general chronology of the events and transactions under inquiry;

---

[3]    *See, e.g.*, Motion at 16 ("Plaintiff has failed to make any allegations which supports the assertion that the fact that CryptoPunk transaction occurred while Celsius was purportedly insolvent indicates Curated acted with an intent to hinder, delay or defraud Celsius' creditors.")

(7) a questionable transfer not in the usual course of business; and

(8) the secrecy, haste, or unusualness of the transaction.

*Actrade Fin.*, 337 B.R. at 809. The identification of badges of fraud helps "focus the inquiry on the circumstances that suggest a *conveyance* was made with fraudulent intent, *viz.* with the purpose of placing a debtor's assets out of the reach of creditors." *Id.* (citing *Sharp Int'l Corp.*, 302 B.R. at 784 (E.D.N.Y. 2003)).

Curated argues that Plaintiff has "failed to allege that any badges of fraud are present with respect to the Crypto Punk transaction," Motion at 9, and further asserts that Celsius has "conced[ed] that [some] badges are not present," Reply at 7. Curated claims that Plaintiff "only argues that three [] badges of fraud are present here." *Id.* However, the proper inquiry in any given case is not "whether some factors are absent," but instead "whether the badges of fraud are present" when the case is viewed as a whole. *Extended Stay*, 2020 WL 10762310, at *89 (citation omitted). Indeed, "the presence or absence of any single badge of fraud" is generally not conclusive proof of fraudulent intent. *Id.* However, the confluence of several badges can constitute "clear and convincing evidence of actual intent." *Actrade*, 337 B.R. at 809.

Here, Plaintiff has pleaded several badges of fraud. First, as to the "lack or inadequacy of consideration" badge, the Complaint provides that the Celsius parties "received no consideration in exchange for the purloined assets." (Complaint ¶ 55.) While Curated focuses on the consideration *Curated* received in connection with the NFT Transfer (Motion at 15), the focus when assessing the "adequacy of consideration" is "the effect that the transfer had on the assets of the bankruptcy estate, not on what changed hands between the debtor and the transferees." *In re Pisculli*, 426 B.R. 52, 67 (E.D.N.Y. 2010), *aff'd*, 408 Fed. Appx. 477 (2d Cir.

14

2011).  Where, as here, the plaintiff asserts that "[n]o consideration ever actually came into the [debtor's] hands," the "consideration" badge is met.  *Pisculli*, 426 B.R. at 67.

Second, as to the "the family, friendship or close associate relationship between the parties," Plaintiff pleads that the Defendants were "closely associated with" Stone and his affiliates.  (Complaint ¶ 95.)

Third, as to the badge related to "the financial condition of the party sought to be charged both before and after the transaction in question," the Complaint provides that the Celsius parties were insolvent at the time of the transfer, which occurred within one month of the filing of the Petition.  (Complaint ¶ 95.; Opposition at 42 (citing 11 U.S.C. § 547(f)).)

Fourth, as to the badge relating to the "existence or cumulative effect of a pattern or series of transactions or course of conduct after the incurring of debt, onset of financial difficulties, or pendency or threat of suits by creditors," the Litigation Administrator alleges that the transfers were "part of a broader scheme in which the Executive Parties improperly misappropriated tens of millions of dollars' worth of CNL, Celsius KeyFi, and Vehicle's assets." (Complaint ¶ 95.)  The Litigation Administrator further alleges that Stone and his affiliates were insolvent at the time of the transfers due to "staggering liabilities owed to CNL related to the loss, mismanagement, and misappropriation of its coins."  (*Id.* ¶ 76.)  More specifically, the Complaint provides that the Executive Parties and Stone were authorized to deploy CNL's coins "between on or around October 1, 2020 and December 31, 2020," before CNL "lost confidence in Executive's leadership and decision-making as CEO of Celsius KeyFi and demanded the return of all of Celsius' coins."  (*Id.* ¶¶ 43, 78.)  The Litigation Administrator asserts that the Executive Parties "accrued millions in liabilities" beginning in late 2020, with "no corresponding increase in its assets."  (*Id.* ¶ 78.)  These financial difficulties were purportedly ongoing at the

15

time of the CryptoPunk NFT transfer in June 2022.  Finally, the transfers were made less than

two months before Celsius commenced an adversary proceeding against the Executive Parties,

indicating that the transfers were made at a time when the transferor was facing the "pendency or

threat of suits by creditors."  (*Id.* ¶ 56.)

Finally, the "general chronology" of the events involving the Transfer satisfies the

corresponding standard for the related badge of fraud.  The NFT Transfer was made within a

month of the filing of these Chapter 11 Cases (and over a year and a half after Stone's

authorization to deploy digital assets on behalf of CNL was revoked).  This timeline is more than

sufficient.  *See, e.g., Pereira v. Grecogas Ltd. (In re Saba Enterprises, Inc.)*, 421 B.R. 626, 644

(Bankr. S.D.N.Y. 2009) (concluding that "chronology" badge met where the "assets of the debtor

were transferred . . . within one year period before the debtor filed for bankruptcy").

Based on "the presence of multiple badges of fraud," the Court finds that the Litigation

Administrator "has adequately alleged the fraudulent intent element of [the] actual fraudulent

transfer claims" with plausibility and particularity.  *Id.*; *see also Extended Stay, Inc.*, 2020 WL

10762310, at *89 (collecting cases finding four to five badges of fraud sufficient to constitute

"clear and convincing evidence of actual intent").  Accordingly, Counts III and IV of the

Complaint adequately state claims for intentional fraudulent transfer.

## 2.  Constructive Fraudulent Transfer

Section 548(a)(1)(B) of the Bankruptcy Code permits avoidance of an otherwise eligible

transfer if:

(i)   The debtor received less than a reasonably equivalent value in exchange for
      such transfer or obligation; and

(ii)  The debtor:

      a.  Was insolvent on the date that such transfer was made or such obligation
          was incurred, or became insolvent as a result of such transfer or obligation;

16

b. Was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital;

c. Intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured; or

d. Made such transfer to or for the benefit of an insider, or incurred such obligation to or for the benefit of an insider, under an employment contract and not in the ordinary course of business.

11 U.S.C. § 548.

a. *Plaintiff Adequately Pleads That the Debtors Received "Less than Reasonably Equivalent Value" for the CryptoPunk NFT*

Curated contends that the Litigation Administrator does not adequately plead that the Debtors received "less than reasonably equivalent value" for the CryptoPunk NFT because Curated purchased the CryptoPunk from Stone for 637.5 ETH, "significantly more than the 130 ETH" purchase price tendered by the KeyFi Executives in February 2021. (Motion at 14.) However, when "[w]hen a debtor transfers its property but the transferee gives the consideration to a third party, the debtor ordinarily will not have received fair consideration in exchange for its property."[4] *HBE Leasing Corp. I*, 48 F.3d at 638. The consideration that Jason Stone or the KeyFi Executives received is irrelevant; the applicable inquiry is instead whether the *Debtors* received reasonably equivalent value, and Curated does not adequately challenge the plausibility of the Plaintiff's assertion that **Celsius** received no consideration at all in exchange for the transfer of the CryptoPunk NFT.[5] (Complaint ¶¶ 54, 66.)

---

[4] The limited exception to this principle, allowing courts to disregard "the fact that the consideration initially was paid to a third party affiliate . . . to the extent the debtor indirectly receives value from the transaction," is inappropriate for consideration at the motion to dismiss stage. *Actrade*, 337 B.R. at 808 (citing *Rubin v. Mfrs. Hanover Trust Co.,* 661 F.2d 979, 991–92 (2d Cir. 1981)). The Court must accept as true all facts alleged in the Complaint, including the Litigation Administrator's assertion that the Debtors received absolutely no consideration in exchange for Curated's purchase of the CryptoPunk NFT. (Complaint ¶¶ 54, 66.)

[5] Curated suggests that Celsius did receive "some" value pursuant to a settlement agreement with Stone and the KeyFi Executives. (Motion at 23.) The Court declines to take judicial notice of the settlement agreement at the motion to dismiss stage, as it is plainly not "integral" to Plaintiff's claims against Curated, a non-party to the agreement. *Palin v. New York Times Co.*, 940 F.3d 804, 811 (2d Cir. 2019).

17

b. *The Debtors Were Insolvent at the Time of the Transfer*

The Celsius Indirect Transfers and the Executive Transfers, as defined in the Complaint,

both culminated with the transfer of the CryptoPunk NFT to Curated on June 26, 2022.

(Complaint ¶¶ 65(b), 66(b).)  The Petition was filed less than one month later, on July 13, 2022.

Although the presumption of insolvency within 90 days of the filing of the Petition under section

547(f) only applies in preference cases, here it "must be perfectly obvious" that the Debtors were

all insolvent a mere few weeks before the filing of the Petition.  *See In re TriGem Am. Corp.*,

431 B.R. 855 (Bankr. C.D. Cal. 2010).

c. *Curated's "Good Faith Mediate Transferee" Affirmative Defense
Does Not Justify Dismissal of the Claims on a Rule 12(b)(6) Motion*

Finally, Curated argues that the constructive fraudulent transfer claims against Curated

must be dismissed as Curated is a "good faith mediate transferee" of the CryptoPunk NFT under

Section 548(c) of the Bankruptcy Code.  (Motion at 15.)  However, Section 548(c) "designates

the transferee's good faith as an affirmative defense which may be raised and proved by the

transferee ***at trial***."  *Actrade*, 337 B.R. at 802 (quoting *Gredd v. Bear, Stearns Secs. Corp. (In re

Manhattan Inv. Fund, Ltd.),* 310 B.R. 500, 508 (Bankr. S.D.N.Y. 2002)) (emphases added).

Curated's assertion of this affirmative defense is not an indication of any pleading deficiency in

the Complaint, and therefore does not provide a proper basis for dismissal.  *See In re Bayou

Group, LLC*, 362 B.R. 624, 639 (Bankr. S.D.N.Y. 2007) ("It is not incumbent on the plaintiff to

plead lack of good faith on the defendants' part because lack of good faith is not an element of a

plaintiff's claim under Section 548(a)(1).").

Curated urges the Court that it may consider this defense at the motion to dismiss stage

because "[a]n affirmative defense may be raised by a pre-answer motion to dismiss under Rule

12(b)(6), without resort to summary judgment procedure, if the defense appears on the face of

the complaint." (Motion at 6, citing *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d

Cir. 1998)). But this Court has previously squarely rejected this very argument, concluding that

the question of a transferee's good faith in a fraudulent transfer action is "an indisputably factual

inquiry to be undertaken by the Court after the close of discovery and need not be resolved at the

motion to dismiss stage." *See In re Dreier LLP*, 452 B.R. 391, 426 (Bankr. S.D.N.Y. 2011).

Accordingly, the Court declines to dismiss the Plaintiff's fraudulent transfer claims against

Curated at this time and concludes instead that Counts III and IV of the Complaint adequately

state claims for constructive fraudulent transfer.

## B. Turnover & Accounting Claims

Counts I, II, and VI assert turnover and accounting claims. Counts I and II request relief

pursuant to 11 U.S.C. § 542(a) and § 542(e), respectively, and Count VI requests an accounting

apparently under state law.

As to Counts I and II, Curated asserts that the Complaint fails to allege a turnover claim

because title to the CryptoPunk NFT is in dispute and has been pleaded as the subject of a

fraudulent transfer, since Section 542(a) requires that the subject property be "property of the

estate." However, if the Court accepted Curated's position, any complaint asserting a fraudulent

transfer claim (or any other claim) relating to purportedly misappropriated estate property would

be prohibited from simultaneously seeking turnover of that misappropriated property. However,

courts frequently permit claims for turnover in the alternative to claims for fraudulent transfer.

*See, e.g.*, *Pereira v. Grecogas Ltd. (In re Saba Enterprises, Inc.)*, 421 B.R. 626, 658 (Bankr.

S.D.N.Y. 2009). Curated's assertion that rightful ownership of the CryptoPunk NFT (under

Curated's anticipated good-faith mediate transferee defense or otherwise) will continue to be

disputed does not undercut the fact that the NFT is the subject of a pre-Petition transfer and is

19

plainly "property of the estate" properly subject to a turnover claim under Section 542(a) for purposes of considering a motion to dismiss.  Likewise, the Complaint adequately pleads a claim for the independent, but related, relief afforded under Section 542(e).

As to Count VI, Curated argues that New York law does not permit claims for accounting where there is no "fiduciary [or confidential] relationship" between the parties to the transaction. (Motion at 22.)  However, as this Court has recognized previously in other adversary proceedings in these Chapter 11 Cases, claims for accounting are warranted where "the consideration and adjudication of issues relat[e] to an account of a complicated character, even in the absence of any element of mutuality or of trust relationship."  *Celsius Network Limited v. StakeHound SA*, Adv. No. 23-01138 (MG) (Bankr. S.D.N.Y.), ECF Doc. # 59 (citing *Ball v. Soundview Composite Ltd.* (*In re Soundview Elite Ltd.*), 543 B.R. 78, 123 (Bankr. S.D.N.Y. 2016)).  Both parties appear to acknowledge the "complicated" nature of the transfers involving the CryptoPunk NFT.  (Motion at 15–18; Reply at 19–20.)  As such, the Court declines to dismiss the accounting claim on the basis of the absence of a confidential or fiduciary relationship between Curated and Celsius.

The Court therefore concludes that Counts I, II, and VI of the Complaint adequately state claims for turnover and accounting.

### C.  Unjust Enrichment Claim

Count V of the Complaint asserts a claim for unjust enrichment.  To prevail on a claim of unjust enrichment under New York law, a plaintiff must demonstrate that the "1) defendant was enriched; 2) defendant's enrichment came at plaintiff's expense; and 3) circumstances were such that in equity and good conscience defendant should compensate plaintiff."  *Shamrock Power Sales, LLC v. Scherer*, 2015 WL 5730339, at *31 (S.D.N.Y. Sept. 30, 2015) (alterations,

quotations, and citations omitted).  Curated argues that this Court should dismiss the Litigation Administrator's unjust enrichment claim, arguing that the Complaint fails to "assert any facts which plausibly allege that Curated was unjustly enriched at Celsius' expense." (Motion at 28.) However, the Complaint explicitly asserts—and Curated does not dispute—that Curated did receive the CryptoPunk NFT (which the KeyFi Executives had previously purchased using Celsius assets), and that Celsius received no consideration in return for the exchange. (Complaint ¶¶ 54, 66.)

Curated alternatively argues that the unjust enrichment claim should be dismissed because, "importantly, [the Complaint] fails to allege that Celsius or Executive Parties transferred the CryptoPunk to Curated or otherwise transacted with Curated." (*Id.*)  However, New York law does not impose any requirement of direct privity between the parties to the applicable transaction. *See Myun-Uk Choi v. Tower Research Capital LLC*, 890 F.3d 60, 69 (2d Cir. 2018) ("[A] New York unjust enrichment claim requires no 'direct relationship' between plaintiff and defendant.")  While Curated concedes this point in the Reply, it maintains that the claim should still be dismissed as the "connection between the parties is too attenuated." (Reply at 8 (citing *Sperry v. Crompton Corp.*, 8 N.Y.3d 204, 215–16 (2007))).  However, Curated itself concedes that it purchased the CryptoPunk NFT "from Jason Stone," the CEO of Celsius KeyFi. (Motion at 17.)  Additionally, Curated acknowledges that the Complaint alleges "that the Executive [Parties] maintained significant control over both [Stone], Celsius KeyFi, and the Celsius Wallets," and that "the Executive Parties purchased the CryptoPunk, and that Curated subsequently received the CryptoPunk from the Executive Parties." (Reply at 7.)  Accordingly, Curated acknowledges, at most, two degrees of separation between itself and the Celsius parties—a far cry from the circumstances leading courts to dismiss unjust enrichment claims on

the basis of attenuation.  *See Sperry*, 8 N.Y.3d at 216 (dismissing unjust enrichment claim on basis that the connection between the purchaser of tires and the producers of chemicals used in the rubber-making process was too attenuated to support such a claim).

The Court therefore finds that Count V of the Complaint adequately states a claim for unjust enrichment.

## IV.    CONCLUSION

For the foregoing reasons, the Motion is **DENIED** in its entirety.

**IT IS SO ORDERED.**

Dated:    April 8, 2025
          New York, New York


                                          *Martin Glenn*
                                          _____
                                          MARTIN GLENN
                                          Chief United States Bankruptcy Judge